460 So.2d 615 (1984)
MISSOURI PACIFIC RAILROAD COMPANY
v.
Jerry K. NICHOLSON, et al.
Nos. 83CA1060, 83CA1449.
Court of Appeal of Louisiana, First Circuit.
October 9, 1984.
Rehearing Denied November 21, 1984.
*617 Charles M. Lanier and Skye McLeod, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, for plaintiff-appellee in No. 83CA1449.
Michael G. Crow, Paul G. Pastorek, Adams & Reese, New Orleans, for defendants-appellants in No. 83CA1449.
Daniel Shaw and Charles M. Lanier, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, for plaintiff-appellee in No. 83CA1060.
Michael G. Crow, Robert J. Conrad, Henry B. Alsobrook, and Paul G. Pastorek, Adams & Reese, New Orleans, William B. Middleton, Middleton & Templet, Plaquemine, *618 for Jerry K. Nicholson and Leonard K. Nicholson appellants in No. 83CA1060.
Before COVINGTON, LOTTINGER and PONDER, JJ.
COVINGTON, Judge.
This is an appeal by defendant[1], Jerry K. Nicholson, who is the owner of El Dorado Plantation, from two judgments of the trial court: the expropriation judgment, which adjudicated a portion of El Dorado Plantation in full ownership to the plaintiff, Missouri Pacific Railroad Company, and awarded defendant the amount of $2,474,998 as compensation and severance damages, and attorney fees in the amount of $385,761; and the fees and costs judgment, which fixed experts' fees at $64,294.94 and costs at $13,943.37. The Railroad answered the appeal.
This lengthy, involved litigation was initially brought by the Railroad against Nicholson, as owner of El Dorado Plantation, and the owners of the neighboring plantations to expropriate a parcel of land for the purpose of constructing a railroad classification yard. Trial commenced on May 31, 1982, and was conducted from May 31-June 4, June 7-11, July 19 and July 26-29, 1982.
On November 19, 1982, the trial court in its written reasons for judgment, after discussing several preliminary matters, found that the Railroad had established its need for the El Dorado tract of land in order to construct a railroad classification yard, and awarded the Railroad the particular tract in fee simple or full ownership. The court also fixed a value on the property expropriated at $2800 per acre, by adjusting the estimates of the several experts for the Railroad and the property owner and considering other factors, or an amount of $842,736. The court then awarded Nicholson severance damages, damages to mineral rights and attorney fees. In the judgment on the rule to fix fees and costs, the trial court determined the fees of the various expert witnesses, fixed certain expenses of the defense and taxed the costs against the Railroad.
El Dorado is a large plantation, composed of about 2,497 acres, having a front of some 7000 feet along Bayou Maringouin and State Route 77 and extending westward into the Atchafalaya Basin Floodway. The plantation lies a few miles south of the town of Livonia, which is some 20 miles west of Baton Rouge on U.S. Highway 190 and about the same distance from Opelousas, which is the next major city to the west.
The plantation was originally devoted to sugar cane; then, afterwards, it was only used for grazing cattle until inherited by Nicholson from his father. In order to make it a successful agricultural venture, Nicholson engaged the services of surveyors, agricultural engineers and other experts, and went to considerable expense for a new layout, for contouring the fields and improving the drainage. Through Nicholson's efforts, the plantation became one of the most productive in the state.[2]
Before the expropriation, El Dorado was composed of three principal portions, to-wit: 454 acres located in the Atchafalaya Basin Floodway and the protection levee, which was used in part for farming and cattle grazing; 1818 acres lying between the levee and the Railroad's main north-south line, which portion was devoted to farming; and the 224 acres lying east of the main line and between the main line and Bayou Maringouin, also used for farming and on which was located the plantation *619 home and several structures used in the farming operations.
It is from the 1818-acre part of El Dorado that the 300.977 acres involved in the expropriation by the Railroad have been selected, leaving a little over 1500 acres of cultivated land separated from the remaining portion of the plantation and the farm-support facilities located thereon.[3]
The plantation home is situated in a cultivated grove of live oak trees, is constructed in the Greek Revival style and is over 140 years old. Architectually, the antebellum home is distinguished by its ornate decorative plaster work and fresco secco wall paintings. It is historically interesting because of its architecture and construction, as well as having belonged to a prominent family in the region, the Barrow. While not in a state of disrepair, the home has not been restored, renovated or remodeled in recent times and bears some of the marks of neglectful past years. The home has been used to some extent by the Nicholson family as what they described as, "a tranquil retreat," reserved by them for "future restoration."
In commenting on the condition of the home, Jean C. Felts, an expert on antebellum homes, testified:
Q. How would you categorize the condition of El Dorado Plantation House, Ms. Felts?
A. I would say it appears to be structurally sound. The downstairs is certainly in livable condition. It has two functioning bathrooms. The second floor, as I mentioned, the plaster has been removed from the ceilings. Again in looking at the house, it is habitable in its and inhabited as it presently stands. It has very fine plaster detailing on the ground floor. Whether this ever existed upstairs or not, I don't know. It is not there at the present time.
Q. Have you noticed any great effort of renovation of the place and expenditures of funds in that respect?
A. Renovation in the sense of museum quality renovation, no. The house has been preserved...
Viewed in its own right, the home is not Tara before the War; and, as the trial court observed, the realization of its historic significance is a matter of recent note (the application and the designation of the residence as a "historic site" occurred after the Railroad announced its "plans" to build the classification yard); but it is an antebellum home.
This portion also includes an area of several acres on which are located the farm support facilities, such as equipment and supply storage sheds, and an office and shop building.
The growth of railroad traffic and increased industrial development within the New Orleans-Baton Rouge corridor dictated that the Railroad construct a new and modern railroad classification yard; and to accomplish this project, an area of land situated in Pointe Coupee Parish, consisting of 555.526 acres, of which 300 plus acres lay within the confines of El Dorado Plantation, was selected.
The acreage selected as the site of the yard lies along the west side of the Railroad's north-south main line, between the towns of Livonia and Maringouin, and south of the junction of the north-south main line with the east-west railroad line.
The facility to be placed upon the expropriated property is a modern, electronic or computerized, gravity classification yard, in which freight trains are received in a long receiving yard; and by moving individual cars over a "hump" in the yard, they are *620 rolled by gravity, and directed by switching onto tracks designated for certain destinations. The purpose of such a classification yard is to aggregate railroad cars in "blocks" going to common destinations. Functionally, cars are pulled from the respective classification tracks in the proper order and assembled into trains in the departure yard. Locomotives and cabooses are connected to such trains. Then, all the necessary tests, such as air-brake tests, are performed; and the trains depart from that yard.
The classification yard will be between 19,000 and 20,000 feet in length by a width of about 2,000 feet. In this area will be placed about forty-two tracks, including ten tracks as storage in transit tracks, with room for the later addition of seven tracks.
Initially the yard will handle about 1700 cars in and about 1700 cars out, but these numbers should increase respectively to between 2500 and 3000 within a few years. About 200 railroad workers will be employed in the yard. The yard is to be well-lighted, with complementary railroad-type structures, and will be in continuous operation, 24 hours a daywith railroad-type activity.
The first issue on appeal concerns whether the railroad should have been granted full ownership of the parcel of land in question, or a servitude. The trial court granted the railroad full ownership of the property after concluding that full ownership was necessary for the purposes of the Railroad. In so deciding, the judge assumed "the defendants (Nicholson) have not seriously questioned the necessity for the taking of property in fee. They have not tried to prove that a servitude would be equal to the fee value."
It is the essence of expropriation that the expropriator "can take no more, either in quantity or estate, than will suffice public wants." New Orleans Pacific Railway Co. v. Gay, 32 La.Ann. 471, 474 (1880). This limitation is a corollary of the prohibition embodied in the several State Constitutions that private entities having the power of expropriation can exercise that power only for "a public and necessary purpose." See, e.g. La. Const. 1974, Art. 1, Section 4.[4] This constitutional prohibition is legislatively implemented by a restriction on railroads to the effect that their power of expropriation may be invoked only for the "construction of railroads," LSA-R.S. 19:2(2),[5] or for "railroad purposes." LSA-R.S. 45:353.[6] Thus, the railroad expropriator must justify and support with cogent reasons that the taking *621 and the estate taken are for "railroad purposes."
Expropriation is "special and exceptional in character, in derogation of common right," and must be strictly construed. Orleans-Kenner Electric Ry. Co. v. Metairie Ridge Nursery Co., 136 La. 968, 68 So. 93 (1915).
The record shows that the railroad only needs exclusive control of the surface of the land; it has no need of any subsurface rights. John R. Osman, Director of Profit Planning for the Railroad and an industrial engineer, testified as an expert witness for the Railroad, and stated that the Railroad needed, for the facility envisioned by the Railroad, exclusive control of the surface of the land, including prohibition against public access by way of roads of any kind. David Ralph Kirk, a railroad planning expert, testified that it was essential that the Railroad control the surface of the land for the facility contemplated. Mr. Kirk commented on the risk of disruption of operations if roads were permitted to cross the yard or if any other industrial or agricultural activities were permitted on the surface of the land. He emphasized that the Railroad could not leave itself in the position where a third person might have the right to come on the surface of the land after the expropriation.
Considering all of the testimony and other evidence in the record, we find that the Railroad is only entitled to expropriate an exclusive personal servitude of use. A personal servitude of use, exclusive to the Railroad, will suffice to give the Railroad the exclusive use and control of the surface of the parcel of land which it needs for the modern classification railroad yard. La. C.C. arts. 639-645; John T. Moore Planting Co. v. Morgan's Louisiana & T.R. & S.S. Co., 126 La. 840, 53 So. 22 (1910); New Orleans Pacific Railway Co. v. Gay. We hold that the trial court erred in adjudicating the subject property to the Railroad in full ownership or in fee simple. We amend and modify the judgment to deny the Railroad full ownership of the parcel of land forming part of El Dorado Plantation; and, instead to grant Missouri Pacific Railroad Company an exclusive personal servitude of use on the subject property for a railroad classification yard, said servitude to endure as long as it is used for said purpose by the Railroad or its successors.
On the question of compensation, property cannot be expropriated or damaged except upon the payment of "just compensation." La. Const. 1974, Art. 1, Section 4. In each expropriation, the landowner must be compensated to the "full extent of his loss." La. Const. 1974, Art. 1, Section 4; La.R.S. 19:9; State, Department of Highways v. Bitterwolf, 415 So.2d 196 (La.1982). The Constitution does not merely insist that the owner of the expropriated property be awarded the fair market value thereof, he must be placed in as good a position pecuniarily as he enjoyed prior to the taking. State, Department of Highways v. Constant, 369 So.2d 699 (La. 1979); Note, Expropriation: Compensating the Landowner to the Full Extent of His Loss, 40 La.L.Rev. 817 (1980).
Thus, for expropriation purposes, "just compensation" to the landowner means the full equivalent in money of the property taken whereby the owner is placed in as good a position as he would have been in had the expropriation not taken place. Marathon Pipe Line Company v. Pitcher, 368 So.2d 994 (La.1979).
Based on various adjustments that he made in the estimates of the experts and a consideration of other pertinent factors, the trial judge found that the property to be expropriated had a value of $2800 per acre, and awarded the sum of $842,736 for the 300.97 acre parcel of land.
Since we have held that the Railroad is entitled to expropriate only a personal servitude of use, we must fix the amount to be paid to the landowner based on the expropriation of a servitude rather than on the taking of the land in full ownership.
To fix the value of the servitude taken, the "highest and best use" of the property must first be ascertained. Our *622 review of the record convinces us that the highest and best use of the land involved is agricultural. That is the use to which this land has been put through a succession of owners. While there is some testimony of its suitability for residential or light industrial use, such testimony reveals that its use for such purposes is too remote and speculative for the land's use to be considered its "highest and best use."
The use of the property considered in fixing the compensation must be one which has a bearing on its value at the time of the taking, and one which would be considered by a willing buyer as having an effect on its value. State, Department of Transportation & Development v. Goldsby, 427 So.2d 580 (La.App. 5th Cir.1983).
Accepting its "highest and best" use as agricultural, we find that the expropriation of the servitude has the effect of leaving the landowner with no use whatever of the surface of the land, so that it can no longer be used for agricultural purposes. His loss, under the circumstances, amounts to a 100 percent loss of use. Hence, the trial court's findings of value of the property taken are still viable; the value estimates of the various experts still have their original validity.
In Dixie Electric Membership Corporation v. Watts, 268 So.2d 128, 132 (La.App. 1st Cir.1972), this Court stated:
Where only a servitude or easement is expropriated and the landowner will continue to have some use of the property included within the right-of-way, the servitude taken should be valued at a percentage of the fee value of the land and not at its full value. Central Louisiana Electric Company v. Fontenot, 159 So.2d 738 (La.App. 3rd Cir.1964), and cases therein cited. Where the expropriation of the servitude completely destroys the suitability of the land for the purpose for which it is best suited, it is proper to award the landowner the full fee value even though merely a servitude is expropriated. However, each case should be decided on its own merits and not by some reference to an automatic percentage.
In the instant case the expropriation of the servitude completely destroys the land for agricultural purposes; hence it is proper to award the landowner the full fee value even though merely a servitude is expropriated.
In an expropriation case, a trial court's findings of value will not be overturned when the award is based upon a reasonable and sound analysis of expert testimony. The trier of fact is authorized and has the right to determine the weight to be given to the testimony of each expert witness, and his determination will not be disturbed in the absence of manifest error. State, Department of Transportation & Development v. Estate of Clark, 432 So.2d 405 (La.App. 1st Cir.1983); State, Department of Highways v. Kornman, 336 So.2d 220 (La.App. 1st Cir.1976).
We have carefully studied the views as to value of the several experts. We think they made the valuation of the property involved much more complicated than was necessary under the circumstances but their estimates were based on sound appraisal principles and their experiences in appraising property similar in nature to that involved in the present expropriation suit. Each of the experts made a sincere effort to evaluate the property involved herein to the best of his ability and genuinely tried to assist the trial judge in fixing an appropriate award. We find that the trial judge did a most commendable job in fixing the compensation to be awarded, based on the various evaluations of the experts. His written reasons for judgment reflect that he gave a reasonable and sound analysis of the expert testimony and gave the experts' testimony and other evidence the weight which they deserved, individually and collectively, and made appropriate adjustments as called for under the circumstances.
In fixing the value of the property expropriated, the trial judge stated:

*623 On the question of compensation the parties presented the testimony of expert witnesses. All of the experts are professional people, well qualified, by education and experience, to testify on the issues of valuation and severance damages. The Court has studied their testimony and written reports and has reached conclusions giving such weight to the testimony of the experts as deemed appropriate according to the thoroughness of their work and the reasonableness of their respective conclusions. The Court was especially impressed by the appraisals and explanations given by Messrs. Dupree and Schexnayder. While Mr. Oren Russell is an appraiser of recognized and respected ability, his appraisals in the present case were unrealistically conservative and unreliable for reasons to be discussed. Mr. Pugh and Mr. Snyder have also been relied on by Courts, and this Court respects their opinions. The Court did get the impression that in their work they reached conclusions as to value before their investigations and analyses were complete. Work was deferred until just prior to trial so that the material would be fresh in their memories and the effort would not need to be repeated in preparation for trial.
Messrs. Dupree and Schexnayder collaborated in their work but this neither enhances nor detracts from the value of their conclusions.
* * * Messrs. Pugh and Snyder agreed that the highest and best use of the property was agricultural, as in its present use, with an additional speculative value for future development into residential or light industrial uses. Messrs. Dupree and Schexnayder felt that the highest and best use of the land was an interim use as agricultural with a potential for use as residential or industrial. They termed the property as transitional in nature. Mr. Russell took an equally logical approach and concluded that the highest and best use of the remainder of the property (including the property to be taken) was agricultural....
* * * * * *
Vernalia plantation, adjacent to the subject property, was purchased by the plaintiff for $3700 per acre. This was for the entire plantation rather than the portion to be occupied by the proposed yard. That entire plantation lies outside the spillway....
* * * * * *
In the present case the Vernalia sale cannot be given significant weight because of the special reasons for the purchase over and above acquisition of the portion of the property to be occupied by the classification yard. The fact that Vernalia Plantation has a value contributed to by an asset of $4,000,000 (the dirt fill) cannot be translated into a market value for neighboring property unless it can be shown that there is a market for dirt fill which can be mined from the defendants property. There was no showing that there is a general market for dirt fill, indeed it could be well argued that the highest and best use for Vernalia Plantation is as a source of dirt fill in this instance while El Dorado Plantation has no such immediate potential.
None of the comparable sales used by any of the appraisers were sales of identical property. The search for comparable sales produced sales in areas quite removed from the location of the subject property. All of the appraisers made adjustments in the price to reflect the advantages and disadvantages of the subject property as compared to the properties described in the sales used as comparables. These adjustments were based principally on the knowledge and experience of the expert witnesses. The witnesses were able to give their reasons for the adjustments but there was no method available to them for a precise calculation of the adjustments to be made.
Mr. Pugh placed a value of $2100 per acre on the property to be expropriated. Mr. Snyder appraised the property at *624 $2000 per acre. Mr. Russell valued it at $1390 per acre. Messrs. Dupree and Schexnayder were of the opinion that it was worth $3000 per acre.
Considering all the experts' testimony and reports and giving such relative weight to their opinions as in the judgment of the Court the persuasiveness of their reasoning justifies, the Court has concluded that the property to be expropriated has a value of $2800 per acre.
We find that the record fully supports the findings of the trial court on the question of compensation to be awarded the landowner for the expropriated property. We fix the amount of the award to Nicholson for the expropriation of the servitude on the subject property at $2800 per acre, for an amount of $842,736.
Severance damages may be awarded in expropriation cases when appropriate and properly proven. State, Department of Transportation & Development v. Tynes, 433 So.2d 809 (La.App. 1st Cir.1983), writ denied 437 So.2d 1153 (La.1983).
The term "severance damages" describes those compensable damages which flow from the partial expropriation of a tract of land, i.e., the difference between the value of the remaining property before and after the taking. State, Department of Transportation & Development v. Estate of Clark; Trancontinental Gas Pipe Line Corporation v. Terrell, 416 So.2d 571 (La.App. 1st Cir.1982); State, Department of Highways v. Wilson, 372 So.2d 632, 633 (La.App. 1st Cir.1979).
Our review of the record reveals a substantial factual basis for the trial judge's award of severance damages. The judge explained his award of severance damages, as follows:
"Some of the defendants' (Nicholson) remaining property is located in the Atchafalaya Basin Floodway. This portion of the property is under cultivation although separated from the greater part of the plantation by a levee. This area has no potential for residential or industrial use. It is far removed from the proposed yard and it cannot be affected by dust, smoke or noise which may be produced by the presence of the yard. Access to this portion of the plantation will not be materially affected and drainage will not be affected at all. The Court has concluded no damage will result to this portion of the property as a result of the taking.
"Mr. Pugh testified that the damages to the rest of the property is determined by capitalizing the loss of earning capacity or rent loss. In his opinion, it is the simplest and proper way to measure damages. He stated that certain improvements east of the railroad will be damaged by the severance, particularly storage and outbuildings. He considered damage to these to be 90% of their value. Damage to the farm because of the problems of access created by the proposed construction is $133 per acre according to Mr. Pugh.
"Mr. Pugh thought damage to the main house, guest house and employee houses would be slight. He appraised this damage at 10% of value of the main house and guest house, and 5% of the value of the employee houses. He said, `This is a judgment factor.' ...
"Mr. Snyder felt damages to the remaining property would be $200 per acre plus an additional $200 per acre for all acreage lying within 2000 feet of the proposed yard for `noise, vibration, smoke, fumes, dust, fuel particles and odors.'
"Mr. Russell was of the opinion there are not any severance damages as a result of access loss. However, because of information received from Mr. Tom Maher of Gulf Coast Agricultural Associates, concerning the additional cost of agricultural operations occasioned by the necessity for moving agricultural equipment from the front of the property to the rear property for a much greater distance and from the loss of point rows, he added an amount for severance damages. Mr. Russell capitalized, over a period of years, the additional cost of operations figure given him by Mr. Maher, and concluded that there would be a total of $563,769 in damages. Mr. Russell *625 seemed somewhat reluctant to concede even this figure as it was his opinion there would no damages from loss of access.
"The principal house on El Dorado Plantation is an antebellum house of sufficient significance to qualify it for the National Register of Historic Places. It was not so registered until after this expropriation proceeding was instituted, but Mrs. Nicholson testified the reason this had not been done prior to that time is that she and her husband feared the notoriety of such action might target their home for burglars. The more immediate threat to the integrity of the plantation posed by the expropriation proceeding apparently overshadowed the fear of possible burglaries.
"The interesting fact is that MOPAC's appraisers tended to think of this home as so much square footage of residential shelter. Its value was considered only as a contributory value to the property as a farm as a whole. Although Mr. Russell, in describing the general region, states, `Throughout South Louisiana are magnificent plantation homes shaded by moss-hung oaks and magnolias, each house with a background of history and romance,' he was not impressed with the house on El Dorado or believed its value immaterial to his appraisal because of his belief that the expropriation would result in no severance damages. In the opinion of the Court he, and to a lesser extent, the other MOPAC appraiser did not give adequate consideration to the effect of operation of a railroad yard upon nearby residential property.
"The approach taken by the defendants' appraisers seemed to the Court to be more reasonable. They separated the main farm property from a 17-acre area occupied by the plantation home, the manager's house, shade trees, swimming pool, patio, walks, a steel shed and dog runs. The 17-acre compound with its improvements was treated as a separate entity for purposes of appraisal before and after the expropriation. This compound was appraised as historic residential before the taking and as employee housing or guest facilities for the industrial complex after the taking and yard construction.
"The remainder of the property was separated according to the relative effects of the expropriation. The Court was of the opinion that the damages are not as great as opined by defendants' experts. Messrs. Dupree and Schexnayder concluded that the property between the levee and the yard will be damaged $1500 per acre. The Court finds that the damage for greater cost and inconvenience of farming the area west of the rail yard, the loss of direct access, the greater interference with traffic across the tracks by virtue of the increased rail traffic (cars which normally would not come to Livonia will be brought to this yard to be classified), and the changes necessitated in conformation of drainage, field, rows, etc. should be fixed at $800 per acre.
"Messrs. Dupree and Schexnayder evaluated the damages to the property lying East of the railroad, less the 17-acre compound, at $1000 per acre. Part of this is due to the fact that some storage sheds, equipment buildings and other structures would exceed requirements for the smaller farm area. This takes into account that the yard will, in effect, separate the farm into two parts. However, the evidence indicated that the possibility of building storage facilities for equipment on the west side of the yard would not be feasible for security reasons, unless a residence were constructed in the same vicinity. For various reasons this would be unlikely and undesirable, there being no access by public road. Thus, in figuring damages to the western portion, it has already been taken into account that the continued storage of equipment on the east side will cause increased inconvenience and expense in farming the western portion of the property. This is reflected in the damage figure to the western portion. If the buildings on the east side are continued in use for the whole plantation, no loss occurs because of excessive accommodation. Additional loss to the east portion is to its value for rural residential development. The Court finds that the damages to this area, including losses resulting *626 from noise, vibrations, smoke, fumes, dust, fuel particles and odors affecting the possible future use of the property for residential purposes, is $350 per acre.
"The 17-acre compound is presently in use for residential purposes. It contains one notable house termed historic because of its age and its representative nature of an architectural period. There is also another comfortable brick veneer home used as a manager's house. MOPAC's appraisers simply did not appreciate the value of the old house. Of course, it is not to be taken in the expropriation, but it is necessary to consider the elements that go into the value of such a structure. It is irreplaceable. The value of this property, like collector's items or museum art, is not necessarily based on utility. In order to determine whether the property will lose value by the new construction and, if so, how much, it is necessary to examine what and who constitutes the market for such property, their motivation, and the features which are attractive to those who buy such property.
"The only appraiser who approached this problem correctly was Mrs. Felts. (Messrs. Dupree and Schexnayder deferred to her judgment on this part of the property). She treated the property as unique but comparable to other antebellum homes. She considered the site and environmental characteristics which would be considered by prospective purchasers of such property. She was concerned also with the esthetic values. (Mr. Henry W. Krotzer, historical architect, attested that the building was a historic structure. It is unique in that it is an American style house built on top of a French style framing plan, and it contains unusual decorative wall paintings probably dated to the 1840's. Mr. Krotzer stated it was a residence of the Barrow family whose principal residence, Afton Villa, has burned.)
"Mrs. Felts believed the property within the 17-acre compound is worth $400,000. After the expropriation it would have a value of $225,000. While Mrs. Felts was very professional and thorough in her analysis, the Court is of the opinion that some of the comparables she used were sales of houses of considerably greater renown. All of the Historic Places she mentioned are well known among historical, tourist and architechtural publications. Photographs of some have appeared, from time to time, in print. While El Dorado may some day be as well known, and therefore achieve as great a marketability among persons of wealth in search of a historic property, it is not presently a household word, so to speak, as Longview, Tezcuco, the Myrtles and Live Oak, for example. Mr. Krotzer said El Dorado is a small plantation house. Several of the houses considered as comparables are much larger and more imposing.
"Mrs. Felts considered that the construction of a hump classification yard behind the main house would detract from the esthetic pastoral view. Mrs. Nicholson also objected to the idea of looking out of her window and seeing a `hump.' The Court is of the opinion that the view will definitely be affected adversely, but not to the extent suggested. Pictures introduced in evidence show unattractive scenes of outbuildings, metal sheds and a freight train on the railroad track. No effort has been made to shield these unattractive sights with trees, bamboo or other landscaping. Some of the additional visual nuisance could well be diminished by use of appropriate landscaping.
"Undoubtedly, there will be damage to the main house and other residence and the 17-acre site. Even Mr. Pugh's 10% and Mr. Snyder's $200 per acre recognize the effects of noise, dust, smoke, etc. In the opinion of the Court, MOPAC's witnesses did not give sufficient consideration to this factor. El Dorado is basically a farm. It presents an atmosphere of calm, serene tranquility. The intrusion of the noise and activity of railroad operations will affect the character of the surroundings. While city real estate may not suffer in value from the addition of commercial and industrial activities, real estate used as a peaceful retreat in a natural setting will be affected *627 by the intrustion of such activities....
"In the opinion of the Court the damages to the 17-acre compound amount to $100,000.
"With regard to the antebellum home, Ms. Felts testified:
"A. Well, I'm saying the historic amenity that is created by the house, the oak grove, the rural character of the plantation as it presently stands will be substantially altered. Someone who is acquiring a residence is typically looking for the history that is associated with the place, a house which is suitable for, in this instance, residential use rather than the type of tour or commercial use that is found in some other locations. And the amenity of being in a quiet, undisturbed atmosphere is important. As part of my research in this project, I interviewed the owners of numerous plantations and they indicated that this was an important factor in those cases where they were using the property as a residence rather than as a showplace that would not be their residence.
"Q. But your specific assignment was to value the 17 acres, was it not?
"A. Yes.
"Q. And it's those 17 acres, is it not, that's designated as a historic site?
"A. Yes.
"In response to questions from the Judge, Ms. Felts responded:
"The historic appeal of a property is what, in my opinion, would change because the people who are typically acquiring historic houses for residential purposes have indicated repeatedly to me over my years of practice that they are interested in the serenity of the setting, the atmosphere, if you will, of the property. The desirability of a historic property also takes into consideration the possible appreciation in value...
"If someone is going to spend an enormous amount of money renovating a historic property, they hopefully expect to at least recover their investment when they sell the property. There is in south Louisiana a substantial market for historic properties. There were 21 or 2 that sold or that were on the market at the time we were doing our research. And it is this desirability as a quiet, country residence that, in my opinion, would be lost due to the proximity of the railroad yard.
"Ms. Felts testimony can be summed up by the following comment:
"I am saying the interest among purchasers of a historic residence would be considerabley affected by the proximity of a major industrial installation."
The record clearly reflects a diminution in value of the other land, after the expropriation of the servitude. The landowner's experts explained the adverse effect of the proposed yard on the farming operations, the limitation of access between the large tract on which most of the crops are grown and the farm support buildings, and the detrimental effect of the proposed yard on the historic residence and on the value of Nicholson's other property. It is established that Nicholson's property is indeed diminished in value due to the total effect of the Railroad's project. Louisiana Resources Company v. Langlinais, 383 So.2d 1356 (La.App. 3rd Cir.1980).
The courts have found that aesthetic considerations, unsightliness of the particular project, excessive noise, an inherent fear of living in close proximity to the particular project, in conjunction with other proven factors, (as in the instant case, bright lights all night long, air pollution and the manner of disposal of waste materials) can support an award for severance damages, if these factors serve to reduce the value of the remainder of the property. Southwest Louisiana Electric Membership Corporation v. Duhon, 313 So.2d 366 (La.App. 3rd Cir.1975), writ denied 318 So.2d 52 (La.1975). We conclude that the evidence supports the award for severance damages.
The next question is the damage to the mineral rights. The testimony of the two experts is conflicting. Joe Byron Adams, *628 as the plaintiff's expert, did not consider that there was any potential for mineral development on the subject property. James Spillers, the landowner's expert, believed the property had mineral value, and that such minerals could be recovered only by directional drilling, which would substantially increase the cost of recovery, and consequently, reduce the value of the minerals. Mr. Spillers expressed the opinion that the damage to the mineral rights amounted to $600,000.
After considering the two diametrically opposed opinions, the trial court found that an award of $250,000 should be made for damage to mineral rights.
Having been granted only a servitude, the Railroad has not taken any mineral rights. The record does not establish any restrictions on the landowner's right to recover minerals, if any; except possibly directional rather than straight drilling would be required. The evidence fails to show that the value of mineral rights, if any, would be measurably diminished by the restriction of surface access to the landowner. Mr. Adams testified that any common pool lying beneath the subject property and adjacent lands would be unitized so as to ensure that the owners of the minerals would receive due compensation for such minerals.
The award for damages to Nicholson's mineral rights cannot stand. From the record, we cannot find that there will be damages to the mineral rights. The burden of proving severance damages, such as the claimed damages to the mineral rights (the minerals were not expropriated), is imposed upon the landowner to establish such damages to a legal certainty and by a reasonable preponderance of the evidence; speculation, conjecture, mere possibility and even unsupported probability are insufficient to support an award. State, Department of Transportation & Development v. Estate of Clark; State, Department of Highways v. Landeche, 400 So.2d 241 (La.App. 4th Cir.1981), writ denied 406 So.2d 609 (La.1981).
Accordingly, we find that the trial court committed manifest error in awarding Nicholson $250,000 as damages to mineral rights. We amend the judgment to delete the award for damages to mineral rights.
In an expropriation suit, the court is empowered to award attorney fees to the landowner in the event the amount of compensation adjudged by the court exceeds the highest amount offered by the expropriator prior to the suit. LSA-R.S. 19:8; State v. Ransome, 392 So.2d 490 (La.App. 1st Cir.1980); Claiborne Electric Cooperative, Inc. v. Garrett, 357 So.2d 1251 (La.App. 2nd Cir.1978), writ denied 359 So.2d 1306 (La.1978). The maximum amount offered prior to suit was $931,954.00. The amount awarded after trial was $2,474,998.00. Hence, the amount awarded exceeds the amount offered, and the court was permitted to award attorney fees, which it did.
In State v. Ransome, 392 So.2d at 495, appears the following:
In considering reasonable attorney fees the Court must first consider these factors in awarding attorney fees, namely: (1) the ultimate result obtained; (2) responsibility incurred; (3) the importance of the litigation; (4) the amount involved; (5) the extent and character of the labor performed; (6) the legal knowledge and attainment and skill of the attorney; (7) the number of appearances made; (8) the intricacies of the facts and law involved; (9) the diligence and skill of counsel; and (10) the Court's own knowledge.
All of the foregoing factors were present, to a greater or lesser extent, in the instant case, and were given due effect by the trial court in making its award for attorney fees. Expropriation of any individual's property, certainly of the nature and extent of the present proceedings, is an important and serious matter which places considerable responsibility on the attorney for the landowner to protect his client's rights and to advocate his client's contentions before the court. The record in the instant case reflects that the landowner's attorney accomplished this advocacy exceedingly *629 well and took the necessary steps to obtain a favorable result for his client. The trial court was of the opinion that the award for attorney fees should be fixed in the amount of $385,761. Considering all of the factors set forth above, we find that the amount awarded is justified in the present case. The amount corresponds with the efforts and the amount of legal work reasonably necessary to protect Nicholson's interests.
Finally, we will consider whether the award of expert witness fees and costs was proper under the circumstances of this case. The determination of expert witness fees and other costs is largely within the sound discretion of the trial court, and the trial court's fixing thereof will not be disturbed on appeal in the absence of abuse of discretion. State, Department of Highways v. Salles, 387 So.2d 1278 (La.App. 1st Cir.1980), writ denied 393 So.2d 744 (La. 1980); Louisiana Intrastate Gas Corp. v. Girouard, 336 So.2d 1042 (La.App. 3rd Cir. 1976).
In fixing such fees and costs, each case turns on its own particular facts. There are, however, certain factors that can be used in fixing expert witness fees, such as the expertise of the expert, the helpfulness of the expert's report and testimony to the trial court, the time spent in testifying as an expert, the amount in controversy and the complexity of the problem addressed by the expert and awards to experts in similar cases. LSA-R.S. 13:3666; State, Department of Highways v. Bougere, 363 So.2d 228 (La.App. 4th Cir.1978), writ denied 364 So.2d 120 (1978); State, Department of Highways v. Miltenberger, 344 So.2d 705 (La.App. 1st Cir. 1977).
But most important, expert witnesses are entitled only to reasonable compensation. Town of Krotz Springs v. Weinstein, 401 So.2d 664 (La.App. 3rd Cir. 1981).
In State, Department of Highways v. Gordy, 322 So.2d 418, 423 (La.App. 3rd Cir.1975), writ refused 326 So.2d 370 (La. 1976), the Court said:
An expert appraiser who testifies in an expropriation suit is entitled to reasonable compensation for his appearance in court and for preparatory work done by him, but the fees allowed him and taxed as costs must be reasonable and they must be somewhat in line with the fees heretofore allowed by the courts of this state in other similar cases. State, Department of Highways v. Black, supra, [207 So.2d 583, La.App., 3rd Cir.1968]. The fees allowed expert witnesses also should be `based on the relative usefulness of their respective testimony.' Melancon v. Oilfield Lubricant Services, Inc., 292 So.2d 908 (La.App. 1 Cir.1974).
In determining whether the fee allowed an appraiser and taxed as costs in an expropriation suit is reasonable, we think consideration must be given to the question of whether the preparatory work done by the appraiser was reasonably necessary, whether it actually tended to show the value of the property taken or severance damages, and whether the conclusions he reached based on that preparatory work were of some usefulness in determining the award which should be made. We also believe that consideration must be given to the value of the property being taken and the amount of severance damages sustained by the landowner.
Based on the foregoing criteria and the test of reasonableness of the awards, we consider the award to James Spillers, the oil and gas expert, to be excessive. We will reduce this fee from $6,329.44 to $3,329.44.
We find no abuse of discretion in the trial court's fixing of the amounts of the other fees and costs. The evidence in the record fully supports these costs. The amounts thereof are reasonable under the circumstances of this case and are consistent with the criteria enunciated by the courts.
For the foregoing reasons, we amend the judgment to deny the Railroad full ownership *630 of the 300.977 acres of El Dorado Plantation and, instead, to grant the Railroad an exclusive personal servitude of use as set out above; we deny Nicholson damages to mineral rights and, thus, delete that award; and we reduce the expert witness fee to James Spillers as set out above.
In all other respects, except as affected by the granting of a servitude rather than ownership, we affirm the judgments appealed. Costs of this appeal are cast against the Railroad. We combined and recast the judgments in the present proceedings to read as follows:
IT IS ORDERED, ADJUDGED AND DECREED That Missouri Pacific Railroad Company is hereby granted an exclusive personal servitude of use for a railroad classification yard on, over and across the following lands forming part of El Dorado Plantation, owned by Jerry K. Nicholson, which lands are shown and set forth in the plan of E.E. Evans and Associates, Civil Engineers, dated February 20, 1981, to-wit:
A certain tract or parcel of land containing 300.977 acres located in Sections 86, 87, 88, 89, 90, 91 and 92, T-6-S, R-9-E, Southeastern Land District of Louisiana, Pointe Coupee Parish, Louisiana, being more particularly described as follows:
Commence at the intersection of the Southwesterly Right-of-Way line of the Missouri Pacific Railroad Company (formerly the Texas and Pacific Railway Company) and the Southerly line of Section 92, T-6-S, R-9-E, Southeastern Land District of Louisiana, called POINT OF BEGINNING:
Thence proceed South 7343'30" West along the Southerly line of Section 92, T-6-S, R-9-E, Southeastern Land District of Louisiana, a distance of 1708.14 feet to a point and corner;
Thence proceed North 4939'19" West a distance of 1830.31 feet to a point and corner;
Thence proceed North 3809'19" West a distance of 3890.00 feet to a point and corner;
Thence proceed North 2439'19" West a distance of 1525.34 feet to the Northerly line of Section 86, T-6-S, R-9-E, Southeastern Land District of Louisiana to a point and corner;
Thence proceed North 7835'14" East along the Northerly line of Section 86, T-6-S, R-9-E, Southeastern Land District of Louisiana, a distance of 1756.83 feet to the Southwesterly Right-of-Way line of the Missouri Pacific Railroad Company (formerly the Texas and Pacific Railway Company) to a point and corner;
Thence proceed South 3809'19" East along the Southwesterly Right-of-Way line of the Missouri Pacific Railroad Company (formerly the Texas and Pacific Railway Company) a distance of 5516.86 feet to a point and corner;
Thence proceed North 5150'41" East along the Southwesterly Right-of-Way line of the Missouri Pacific Railroad Company (formerly the Texas and Pacific Railway Company) a distance of 25.00 feet to a point and corner;
Thence proceed South 3809'19" East along the Southwesterly Right-of-Way line of the Missouri Pacific Railroad Company (formerly the Texas and Pacific Railway Company) a distance of 1495.92 feet to the POINT OF BEGINNING.
The said servitude is to endure as long as it is used as a railroad classification yard by the Missouri Pacific Railroad Company or its successors.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of defendant, Jerry K. Nicholson, and against the plaintiff, Missouri Pacific Railroad Company, fixing the award for compensation to him for the expropriation of the servitude on, over and across the hereinabove described parcel of land in the amount of $842,736 and fixing the award for severance damages to his other property in the amount of $1,632,262.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of defendant, Jerry K. Nicholson, and against the plaintiff, Missouri Pacific Railroad Company, fixing *631 the award for attorney fees in the amount of $385,761.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff, Missouri Pacific Railroad Company, and against defendants, Jerry K. Nicholson and Leonard K. Nicholson, denying defendants' claim for damages to mineral rights and the claim therefor is dismissed.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of Missouri Pacific Railroad Company ordering the termination, cessation and cancellation of all rights and interests that defendant, Jerry K. Nicholson, or any owner or owners of El Dorado Plantation have or may have to any right of way across or to construct, maintain and use any crossing or crossings over the north-south main line of plaintiff's railroad and the right of way thereof lying immediately east of the lands hereinabove described, and any and all rights that defendant or any owner or owners of El Dorado Plantation have or may have in and to any rights of way across, or to construct, maintain and use any farm road or roads within, the area of the lands hereinabove described, provided, however that pursuant to stipulations of record herein defendant, Jerry K. Nicholson, shall have the right to use any existing crossing or crossings and any existing farm road or roads until the vehicular roadway hereinafter provided for is constructed by plaintiff and tendered for use, at which time such right of use herein and hereby reserved shall cease and terminate and be cancelled.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the servitude of use of the above described lands be and it is granted to said plaintiff subject to a 40-foot wide servitude of way herein and hereby reserved in favor of El Dorado Plantation hereinabove described, which said 40-foot wide servitude of way is depicted on that certain plan or drawing of record herein prepared by E.E. Evans and Associates, Civil Engineers, dated June 30, 1982 and is described as follows, to-wit:
A certain tract or parcel of land containing 6.65 acres located in Sections 86, 87, 88, 89, 90, 91 and 92, T-6-S, R-9-E Southeastern Land District of Louisiana, Pointe Coupee Parish, Louisiana being more particularly described as follows:
Commence at the intersection of the Southwesterly Right-of-Way line of the Missouri Pacific Railroad Company (formerly the Texas and Pacific Railway Company) and the Southerly line of Section 92, T-6-S, R-9-E, Southeastern Land District of Louisiana, thence proceed South 7343'30" West along the Southerly line of Section 92, T-6-S, R-9-E, Southeastern Land District of Louisiana, a distance of 1660.24 feet to the POINT OF BEGINNING;
Thence proceed South 73"43'30" West along the Southerly line of Section 92, T-6-S, R-9-E, Southeastern Land District of Louisiana, a distance of 47.90 feet to a point; Thence proceed North 4939'19" West a distance of 1830.31 feet to a point;
Thence proceed North 3809'19" West a distance of 3890.00 feet to a point;
Thence proceed North 2439'19" West a distance of 1525.34 feet to the Northerly line of Section 86, T-6-S, R-9-E, Southeastern Land District of Louisiana to a point;
Thence proceed North 7835'14" East along the Northerly line of Section 86, T-6-S, R-9-E, Southeastern Land District of Louisiana, a distance of 41.09 feet to a point;
Thence proceed South 2439'19" East a distance of 1511.19 feet to a point;
Thence proceed South 3809'19" East a distance of about 3881.24 feet to a point;
Thence proceed South 4939'19" East a distance of 1852.64 feet to the POINT OF BEGINNING,
and which said servitude of way shall be deemed to be a covenant running with the land in favor of the said El Dorado Plantation, to be exercised by the owner or owners of said plantation and by the vendees, assignees, successors, licensees, lessees or invitees of said owner or owners, as well as *632 by the holder or holders of any mineral rights or servitudes affecting said plantation, provided, however, that plaintiff and those on the business of plaintiff, as well as any additional persons who may from time to time be designated by plaintiff shall also have the right to use such servitude of way.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that plaintiff, Missouri Pacific Railroad Company, shall at its own cost and expense construct and thereafter maintain within the limits and confines of the above described 40-foot wide servitude of way and also within the limits and confines of that certain contiguous 40-foot wide servitude of way created and existing in favor of the owner or owners of El Dorado Plantation, his heirs, successors and assigns, on or affecting Kenmore Plantation, which latter servitude of way was created by act of Missouri Improvement Company, dated July 29, 1982, passed before Margaret L. Bergeron, Notary Public in and for the Parish of West Baton Rouge, Louisiana, registered in Conveyance Book 233, Entry No. 83, Pointe Coupee Parish, Louisiana, an all-weather, aggregate-surfaced vehicular roadway, capable of bearing the loads associated with heavy farm equipment, which said roadway shall be at all times available for use by the owner or owners of El Dorado Plantation and by the vendees, assignees, successors, licensees, lessees or invitees of said owner or owners, as well as by the holder or holders of any mineral rights or servitudes affecting the said El Dorado Plantation, for the purpose of vehicular access to and from Louisiana Highway No. 77 at or near the lower line of Kenmore Plantation to and from the northern boundary of El Dorado Plantation, including connections with any and all farm roads existing on El Dorado Plantation that extend westerly from the western boundary of the lands hereinabove described, and which said roadway shall consist of a 24-foot wide wearing course, all-weather roadway, with three foot shoulders on either side having no more than a three inch difference in grade from the center-line of the road to the edge of each shoulder, for a total roadbed of 30 feet; with swale ditches on either side of the road having a two-to-one side slope in each ditch and ranging from a minimum of one foot to a maximum of four and 3/4 feet in depth; with the base of said road to be constructed either of eight to twelve percent lime-treated base or a filter fabric-type roadway; with the wearing surface of said road to be of six inch aggregate of either limestone or other type of available stone; with the elevation of said road to have no more than one foot to two foot difference from the finished grade of the perimeters of the adjoining railway yard; with culverts adequate to carry water under the entire 40-foot width of the servitude of way at the location of all existing ditches extending westerly from the said road; and with turnouts on to each of the farm roads now existing on the westerly portion of El Dorado that intersect with the western boundary of the lands hereinabove described, together with culverts adequate to carry water under each such turnout through the said swale ditches to be constructed as aforesaid; provided, however, that plaintiff and those on the business of plaintiff, as well as any additional persons who may from time to time be designated by plaintiff shall also have the right to use such road and provided further that the owner or owners of the westerly portion of El Dorado Plantation shall have the right to construct at the expense of such owner or owners additional turnouts connecting such road with any additional farm roads that said owner or owners may choose to construct on the westerly portion of El Dorado Plantation in the future.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the hereinabove described lands be and they are hereby adjudged to be free and clear of all leases, liens or encumbrances appearing of public record and the Clerk of Court is hereby ordered and directed to cancel and erase from the public records of Pointe Coupee Parish to the extent that they cover and affect the lands hereinabove described, the following inscriptions, viz:
*633 1. Farm lease between Jerry K. Nichol son as landlord, and N.H. Bruckerhoff, as tenant, for a term from February 1, 1974 to January 31, 1975 and thereafter from year to year until written notice of termination is given by either party, recorded in Conveyance Book 115, Entry 141 of the records of Pointe Coupee Parish, Louisiana.
2. Mineral rights or servitudes owned by Leonard K. Nicholson, pursuant to Act of Transfer dated July 18, 1982, appearing of record in Conveyance Book 232, Entry Number 138 of the records of Pointe Coupee Parish, Louisiana, but only to the extent that they would permit or allow the right to drill or explore for minerals from the surface of the lands herein described.
3. Oil, Gas and Mineral lease dated January 21, 1966, by and between Jerry K. Nicholson, individually, and Elizabeth Nicholson Fischer, as Trustee of the Leonard K. Nicholson Trust, as Lessor, and El Tres Petroleum Corporation, a Louisiana corporation, as Lessee, recorded in Conveyance Book 63, Entry 158 of the records of Pointe Coupee Parish, Louisiana, but only to the extent that it would permit or allow entry upon or exercise of the right to drill or explore for minerals from the surface of the lands herein described.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the prayer of plaintiff's petition, more fully set forth in Article XI thereof, for a temporary construction servitude and a perpetual servitude of use for cleaning, revising, enlarging and maintaining drainage ditches for a distance of 100 feet west of the boundary of the lands herein described, and for the entire distance between the east boundary of said lands and Bayou Maringouin, be and the same is hereby denied and the claim therefor is dismissed.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Missouri Pacific Railroad Company pay Jerry K. Nicholson the following amounts as total satisfaction of its obligation for costs and experts' fees expended in the above-entitled expropriation action:

EXPERT FEES
TBS $ 5,000.00
CEI 1,000.00
Alton Mangum 1,200.00
Charles Dean 8,120.00
Harry Braud 400.00
Claude Lowry 2,798.00
Harry Krotzer 472.50
James Spillers 3,329.44
Tom Dupree 16,300.00
Jean Felts 6,100.00
Norbert Schexnayder 16,575.00
 _________
Total Experts' Fees
Awarded $61,294.94
 COSTS AMOUNT
Court Costs 1,717.22
Transcripts 10,107.70
Photographs
 R.R. Yards 25.47
 Farm Equipment 2,054.00
 Processing for Trial
 Copies 38.48
 _________
Total Costs Awarded 13,943.37
TOTAL AWARDED $75,238.31

The above calculations include, as taxable costs, awards for:
1. Cost of photographs actually introduced in evidence.
2. Cost of depositions, if any, introduced in evidence or which support or form the basis for any stipulation.
3. Fees of all experts for testifying, either in open court or by deposition, if any were actually introduced in evidence.
4. All reasonable expenses of testifying experts in preparation of trial and development of facts upon which to base their opinions in connection with the issues of value of the property, severance damages, and necessity of taking.
5. Expert fees for attending but not testifying at trial provided such expert subsequently actually testified, and further provided such attendance was during presentation of evidence relevant to the matters upon which such expert would later testify.
6. Court reporter charges for transcripts.
7. Court costs except subpoenas to a party defendant.
*634 The following items are not to be taxed as costs and are not included in the calculations above.
1. Costs in connection with environmental studies related to the need for permits.
2. Cost of depositions not introduced in evidence.
3. Attorneys' travel and incidental expenses.
4. Costs of copies, postage, maps, telephone, etc.
5. Experts' charges for consultation with counsel.
6. Fees of non-testifying experts.
AMENDED AND AFFIRMED IN PART, REVERSED IN PART; JUDGMENT RECAST AND RENDERED.

ON APPLICATION FOR REHEARING
Rehearing denied.
We acknowledge a mathematical error in including an award for damages to mineral rights in the award for severance damages. The judgment is amended to reduce the award for severance damages by the sum of $250,000. The award for severance damages is fixed at $1,382,262.
NOTES
[1] Leonard K. Nicholson was also named as a defendant and is named as an appellant in this appeal. He is the son of Jerry K. Nicholson and is the owner of a 50% undivided interest in the minerals.
[2] Nearly 90% of El Dorado, 2,216 acres is under cultivation: two-thirds in soybeans and one-third in different varieties of corn, in rotation. In the three years prior to the Railroad's action, El Dorado produced 41 bushels per acre of soybeans (about 17% more productive than the parish average and 64% more productive than the state average), and, as to corn, El Dorado produced 47% more than the state average of 73 bushels per acre.
[3] Before trial, the Railroad effected settlement with the owners of Vernalia Plantation. One of these owners, N.H. Bruckerhoff, was also the farm lessee of El Dorado; and in settling, he agreed to the taking of his rights under the farm lease as affected by the 300.97 acres taken from El Dorado. At the outset of the trial, the Railroad settled with the owners of Kenmore Plantation. During the trial, the suit against the owners of Woodley Plantation was severed from the present action because of the death of one of the owners. Thereafter, settlement was reached with the owners of Woodley. Thus, only El Dorado became the subject of the full trial to judgment, and only Nicholson was left as a defendant.
[4] La. Const. 1974, Art. 1, Sec. 4 provides:

Every person has the right to acquire, own, control, use, enjoy, protect and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question. In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss. No business enterprise or any of its assets shall be taken for the purpose of operating that enterprise or handling competition with a government enterprise. However, a municipality may expropriate a utility within its jurisdiction. Personal effects, other than contraband, shall never be taken.
This Section shall not apply to appropriation of property necessary for levee and levee drainage purposes.
[5] LSA-R.S. 19:2(2) provides:

Where a price cannot be agreed upon with the owner, any of the following may expropriate needed property: ...
Any domestic or foreign corporation created for the construction of railroads, toll roads, or navigation canals; ...
[6] LSA-R.S. 45:353 provides:

Foreign railway companies extending, constructing and operating their lines of railroad into and through Louisiana may expropriate land and other property for their railroad, right of way, switches, sidings, branches, spurs, depots and depot grounds, yards, and any land and property for railroad purposes, in the manner provided by the expropriation laws of the state.