**ILLINOIS CENTRAL RAILROAD**
Company

v.

**James E. MAYEUX, et al.**

**Civil Action Nos. 99–CV–667, 99–678–C–1.**

United States District Court,
M.D. Louisiana.

Sept. 11, 2000.

---

Francis S. "Frank" Craig, III, Richard Charles Ellis, Bennie Hu, Breazeale, Sachse & Wilson, Baton Rouge, LA, for Illinois Central Railroad Co.

James Elwood Moore, Jr., Chase McNeil McCalip, Shockey & Ziober, Baton Rouge, LA, for James E. Mayeux, Barbara R. Mayeux, A Certain Tract of Land Containing 17.6 Acres.

Oscar E. Reed, Jr., The Laborde Law Firm, LLC, Lafayette, LA, for Louisiana Intrastate Gas.

Nancy Scott Degan, Edward B. Poitevent, II, Phelps, Dunbar, L.L.P., New Orleans, LA, for Acadian Gas Pipeline System.

F. Barry Marionneaux, Marionneaux & Marionneaux, Plaquemine, LA, for Ethyl Corporation.

Alvin John Herbert, III, Barry Herbert Grodsky, Middleberg, Riddle & Gianna, New Orleans, LA, for Liquid Carbonic Industries.

Leigh Ann Schell, James L. Trinchard, New Orleans, LA,for Bridgeline Gas Distribution, LLC.

Richard Franklin Zimmerman, Jr., Kantrow, Spaht, Weaver & Blitzer, Baton Rouge, LA, for Air Products & Chemicals, Inc.

## ORDER AND REASONS

CLEMENT, District Judge.

Before the Court is Illinois Central Railroad Company's Motion for Summary Judgment. For the following reasons, the Motion is GRANTED.

### A. BACKGROUND

These consolidated cases both arise out of Illinois Central Railroad Company's

("Illinois Central") attempt to expropriate land owned by James E. Mayeux and Barbara Richard Mayeux (collectively, the "Mayeuxs") in Iberville Parish, Louisiana, in order to build a spur line from its main track to the LBC PetroUnited Sunshine terminal. The Mayeuxs contest the expropriation on the grounds that it will not serve a "public and necessary" purpose as required by the Louisiana Constitution.

## B. *STANDARD OF REVIEW*

This matter comes before the Court on Illinois Central's Motion for Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). Under this standard, the moving party bears the burden of establishing the absence of genuine issues of material fact, and the Court must draw all justifiable inferences in favor of the opposing party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Oliver Resources PLC v. International Finance Corp.*, 62 F.3d 128, 130 (5th Cir. 1995). Typically, the Court may find summary judgment appropriate only if it is satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir.1990).

In bench trials, however, the Fifth Circuit "has arguably articulated an even more lenient standard for summary judgment...." *United States Fidelity and Guaranty Co. v. Planters Bank & Trust Co.*, 77 F.3d 863, 865 (5th Cir.1996) (quoting *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 273 n. 15 (5th Cir.), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 107 (1987)). In *Phillips Oil*, the Fifth Circuit noted that "while the standard for summary judgment 'mirrors the standard for directed verdict under Federal Rule of Civil Procedure 50(a), [in] the same fashion in nonjury cases it mirrors the standards for dismissals provided by Rule 41(b).'"[1] *Fidelity and Guaranty*, 77 F.3d at 865 (brackets in original) (quoting *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 223 (5th Cir.1986)). In *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir.1978), the Fifth Circuit held that "[i]f a decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved." Thus, "*Nunez* established that even at the summary judgment stage a judge in a bench trial has the limited discretion to decide that the same evidence, presented to him or her as trier of fact in a plenary trial, could possibly lead to different result." *Fidelity and Guaranty*, 77 F.3d at 866.

The case at bar, scheduled to be tried by the Court in December, appears to be a prime candidate for this special standard of summary judgment. The parties have narrowed the issues to two whether the proposed expropriation will serve a(1) public and (2) necessary purpose. The parties

---

1. Under Rule 41(b), the defendant in a nonjury case may move for dismissal after the plaintiff has presented his evidence, on the grounds that the plaintiff has demonstrated no right to relief.

have submitted a wealth of information for the Court's consideration on summary judgment and most likely would submit the same evidence at trial. Moreover, most of the underlying facts are undisputed and the weight to be given the deposition testimony does not turn on witness credibility. For all of these reasons, the Court finds that it may decide this matter on summary judgment.

## C.  *FACTS*

LBC PetroUnited ("PetroUnited") operates the Sunshine public bulk liquid terminal in the town of St. Gabriel, located in Iberville Parish, Louisiana. (McKinney Depo. p. 27; Illinois Central Undisputed Material Fact 3.) The Sunshine terminal is used to store manufactured chemicals before they are sent to the next link in the distribution chain. (McKinney Depo. p. 50.) Currently, the Sunshine terminal is accessible by ship, barge and truck, but not by trail. (*See, e.g.* McKinney Depo. p. 27.) According to PetroUnited, the lack of rail access puts Sunshine at a competitive disadvantage and management has considered building a rail into the terminal since at least the early 1980s. (*See, e.g.*, McKinney Depo. pp. 12 and 15.) When LBC, a French concern, acquired PetroUnited in 1998, management revived its interest in making Sunshine rail-accessible. (McKinney Depo. p. 16.)

In order to build a rail into the Sunshine terminal, the tracks would have to cross property owned by the Mayeuxs. (Illinois Central Undisputed Material Fact 21.) Accordingly, Michael McKinney, PetroUnited's president, approached Mr. Mayeux with an offer to buy a strip across his property. (McKinney Depo. p. 16.) Mr. Mayeux rejected PetroUnited's offer, and PetroUnited turned to Illinois Central.

Illinois Central is a common carrier railroad corporation authorized to engage in the business of constructing, operating and maintaining railroads for the purpose of supplying the public with railroad service in the State of Louisiana and elsewhere. (Illinois Central Undisputed Material Fact 1.) As such, Illinois Central is authorized to expropriate needed property pursuant to La.R.S. 19:2(2) and 43:353. (Illinois Central Undisputed Material Fact 2.) Illinois Central's mainline runs along Louisiana Highway 30 in Iberville Parish, bordering the Mayeux property. (Illinois Central Undisputed Material Fact 3.)

In late 1998, PetroUnited and Illinois Central executed a Letter of Intent with regard to a proposed construction of a spur track from Illinois Central's mainline to the Sunshine terminal. As a term of understanding, Illinois Central agreed to identify all parties with a recorded property interest in and to the parcels of land over which the spur line would be built and attempt to negotiate agreements to acquire or extinguish those parties' property rights. Should negotiations fail, it was understood that Illinois Central would seek, "upon PetroUnited's written consent," to expropriate the necessary servitude. PetroUnited was to finance construction of the spur and would be its owner, and Illinois Central would pay a rebate to PetroUnited for each car of revenue traffic originating from and delivered to the Sunshine terminal until the cost of construction was fully amortized.

On February 12, 1999 and July 26, 1999, Illinois Central sent letters offers to the Mayeuxs to acquire servitude, (Illinois Central Undisputed Material Fact 4), and on May 27, 1999, Illinois Central representatives met with Mr. Mayeux and his attorney on the Mayeux property to discuss and examine various options for possible routes for the spur track. (Illinois Central Undisputed Material Fact 5.) The Mayeuxs refused and/or rejected Illinois Central's

offers. Consequently, Illinois Central filed its Complaint for Expropriation in federal court on August 13, 1999. The Mayeuxs filed suit against Illinois Central in state court the same day. The Mayeuxs' suit was removed and consolidated with Illinois Central action.

## D. EXPROPRIATION

In Louisiana, two statutes confer expropriation power upon railroads. First, Louisiana Revised Statute 19:2(2) provides that, where a price cannot be agreed upon with the owner, "[a]ny domestic or foreign corporation created for the construction of railroads" may expropriate needed property. Second, Louisiana Revised Statute 45:353 states that

> Foreign railway companies extending, constructing and operating their lines of railroad into and through Louisiana may expropriate land and other property for their railroad, right of way, switches, sidings, branches, spurs, depots, and depot grounds, yards, and any land and property for railroad purposes, in the manner provided by the expropriation laws of the state.

This power to expropriate is not absolute. Article 1, Section 4 of the Louisiana Constitution prohibits the taking or damaging of property by private entities authorized by law to expropriate, "except for a public and necessary purpose and with just compensation paid to the owner." "This constitutional prohibition is legislatively implemented by a restriction on railroads to the effect that their power of expropriation may be invoked only for the 'construction of railroads,' LSA–R.S. 19:2(2), or for railroad purposes[,] LSA–R.S. 45:353." *Missouri Pacific R.R. Co. v. Nicholson,* 460 So.2d 615, 620 (La.App. 1st Cir.1984) (footnotes omitted).

The Mayeuxs argue that, under the circumstances of this case, expropriation "would not be for a 'public and necessary purpose,' and would, therefore, be prohibited under Article 1, Section 4 of the Louisiana Constitution." Petition ¶ 7. Specifically, the Mayeuxs argue that the expropriation is not for a public purpose because only PetroUnited and Illinois Central would benefit from the proposed spur and that rail access is unnecessary because the PetroUnited terminal is already served by ship, barge and truck.

### 1. Public Purpose

The parties' memoranda point out that Louisiana courts have been somewhat inconsistent in finding a public purpose when a proposed expropriation is alleged to serve only a single, private entity. In an early case, *River & Rail Terminals, Inc. v. Louisiana Ry. & Nav. Co.,* 171 La. 223, 130 So. 337 (1930), a railroad, Louisiana Railway & Navigation, laid a spur track across the property of River & Rail Terminals in order to reach the property of the New Orleans Refining Company. River & Rail accused Louisiana Railway of illegal and tortious trespass and sought injunctions prohibiting Louisiana Railway from using the track and requiring the track's removal. Although not an expropriation action, the Louisiana Supreme Court stated that "[t]he outstanding issue in this case is whether the spur track in question is for a private or public purpose." *Id.* 130 So. at 338. River & Rail argued that "the spur track was constructed for the private accommodation of both defendant railroad and the oil refinery, and to make the private business of both more profitable." *Id.* at 339.[2] The Louisiana Supreme Court agreed, finding that the public had the right to use neither the refinery's loading station nor the spur track and that the

2. This is essentially the same argument the Mayeuxs advance.

spur track "serves no other enterprise but the New Orleans Refining Company, and ... was constructed solely for the purpose of enabling defendant company to handle tank cars shipped out of the refinery." *Id.* at 340. In so holding, the Court stated, "It is well settled that there must be a general public right to a definite use of the property, as distinguished from a use by a private individual or corporation which may prove beneficial or profitable to some portion of the public." *Id.* at 340.

Later decisions, however, have not followed this restrictive line. For example, in *Dixie Pipeline Co. v. Barry,* 227 So.2d 1 (La.App. 3d Cir.1969), the Louisiana Third Circuit Court of Appeal acknowledged that a proposed pipeline would connect a privately owned plant with the proposed expropriator's pipeline, but nonetheless found a public purpose where the plant produced propane from the raw stream it received from area producers and where "the effect of the pipeline will be to transport large quantities of propane gas from the plant to a large market in several states." *Id.* at 7. Similarly, in finding a public purpose for a proposed pipeline that connected to a single enterprise in *Louisiana Resources v. Greene,* 406 So.2d 1360 (La.App. 3d Cir.1981), the Louisiana Third Circuit Court Appeal held that "[t]he public need not be supplied gas directly from the pipeline for which expropriation is sought for the expropriation to meet the test of public purpose." *Id.* at 1364. Rather, "[t]he pipeline serves a public purpose merely by placing more natural gas in the stream of commerce." *Id.* In the

light of the cases since *River & Rail,* this Court agrees with the Louisiana Third Circuit Court of Appeal that, despite *River & Rail's* "restrictive language, the Louisiana jurisprudence has not defined 'public purpose' so narrowly." *Town of Vidalia v. Unopened Succession of Ruffin,* 663 So.2d 315, 319 (La.App. 3d Cir.1995). "Rather, any allocation to a use resulting in advantages to the public at large will suffice to constitute a public purpose." *Id. Accord Calcasieu & S. Ry. Co. v. Bel.,* 224 La. 269, 69 So.2d 40, 43 (1953) (public purpose test satisfied where proposed railroad expropriation "will tend to enlarge the resources, increase the industrial energies, and promote the productive powers of a considerable number of the inhabitants or business of a section of this state, and manifestly will contribute to the general welfare and prosperity of the community in which it is located").[3]

■ Here, the Court has little trouble concluding that the proposed spur line will serve a public purpose. Much like the plant in *Dixie Pipeline,* the Sunshine terminal receives chemicals from a wide variety of companies. Unlike the plant in *Dixie Pipeline,* PetroUnited never takes over ownership of materials it receives. (*See* Illinois Central Undisputed Material Fact 11). Rather, at all times, the manufactured chemicals remain in the ownership of the companies who transported them into the Sunshine terminal. It is also undisputed that Illinois Central and the shippers and/or owners of the chemicals will make all arrangements for shipping the chemical into and out of the

---

3. In *United Gas Pipe Line Co. v. Blanchard,* 149 So.2d 615 (La.App. 1st Cir.1963), the Louisiana first Circuit Court of Appeal affirmed the trial judge's finding that a proposed pipeline did not serve a public purpose. The court took great pains to note, however, that the plaintiff pipe line company had failed to come forward with evidence of public ne-

cessity. For example, the Court noted that "in the present cases it was merely stated that the purpose of the line was for a public use without clarifying or elaborating upon what that use was, and without in any way showing there would be any other use for the line than to serve the two plants." *Id.* at 620. That certainly is not the situation in case at bar.

Sunshine terminal by rail and that PetroUnited will not be involved in making these arrangements. (*See* Illinois Central Undisputed Material Fact 12.) Thus, it is manifestly evident that the proposed spur line will be used to ship the products of numerous entities and not merely to ship the products of the entity to which the spur track is connected. This fact alone leads the Court to reject the Mayeuxs' contention that the proposed spur line will benefit only PetroUnited and Illinois Central.[4]

Additionally, the Court finds that the proposed spur line may increase the overall usage of the Sunshine facility, which likely will serve a public purpose. The evidence indicates that Illinois Central and PetroUnited both believed that at least some chemical companies have avoided shipping their products into the Sunshine terminal because of the lack of rail access. Increased utilization of the terminal may benefit the local community by generating more revenue and creating new jobs. Moreover, the evidence indicates that Illinois Central and PetroUnited both believed that the rail service will create more options and more competition within the chemical storage and shipping industry and thereby produce lower prices and increased efficiency, which are in the public interest. And the Court agrees with Illinois Central that the evidence indicates that the proposed spur would create a better transportation infrastructure for domestic and international entities by linking waterborne and rail transportation in the center of the heavily industrialized corridor between Baton Rouge and New Orleans.

■ The parties disagree over whether the proposed rail spur will be available for use by Illinois Central to serve any other business or industry which may be constructed or operate in the vicinity and whether the addition of rail service will reduce truck traffic. Although an affirmative answer to both issues would undoubtedly bolster the Court's finding, the Court finds that it need not resolve the issues in order to find that the proposed spur line would be for a public purpose. Furthermore, PetroUnited's proposed role in financing the spur line does not establish that the spur is intended solely for private benefit. *See, e.g., Union Lime Co. v. Chicago & N.W.R. Co.*, 233 U.S. 211, 34 S.Ct. 522, 58 L.Ed. 924 (1914).

### 2. *Necessary Purpose*

The Mayeuxs argue that the proposed rail spur is not necessary for several reasons. First, the Mayeuxs point out that the Sunshine terminal is already served by ship, barge and truck and that rail service would offer merely another shipping option. The Mayeuxs also note that another storage terminal on the west side of Mississippi,[5] already has rail service provided by the Union Pacific Railroad. And the Mayeuxs observe that no potential customer has definitively pledged that it would use the Sunshine terminal if it acquired rail service and suggest that the proposed spur is merely a product of wishful thinking. None of these factors, however, mean that the proposed spur is not "necessary".

■ As noted above, the "public and necessary" requirements of the Louisiana

---

4. Of course, Illinois Central and PetroUnited hope to profit from any increase in traffic into and out the Sunshine terminal. The mere existence of a private profit motive, however, does not negate a rail line's public character. Where, as here, the private profit motive leads

companies to provide a public service, it simply illustrates the continuing relevance of Adam Smith's notion of the invisible hand.

5. The Sunshine terminal is on the east bank.

Constitution are "legislatively implemented by a restriction on railroads to the effect that their power of expropriation may be invoked only for the 'construction railroads,' LSA–R.S. 19:2(2), or for 'railroad purposes[,]' LSA–R.S. 45:353." *Missouri Pacific R.R. Co.*, 460 So.2d at 620. Illinois Central need not prove that the spur line is *only* means by which companies can bring manufactured chemicals to market, but rather must show that the proposed expropriation is for railroad purposes and that the "amount of land and the nature of the acreage taken [are] reasonably necessary for the accomplishment of the proposed project." *Calcasieu–Cameron Hosp. Serv. Dist. v. Fontenot*, 628 So.2d 75, 78 (La.App. 3d Cir.1993). Moreover, "[i]t is not necessary ... to show actual, immediate, and impending necessity for the expropriation. It is sufficient, in carrying out the general plan of improvements contemplated in the near future, to show that the defendant's land will be needed for the purposes set out in the petition." *Id.* (citing *Iberia Parish v. Cook*, 238 La. 697, 116 So.2d 491, 494 (1959) quoting *City of New Orleans v. Moeglich*, 169 La. 1111, 126 So. 675 (1930)).

 Here, it is undisputed that a spur off the Illinois Central mainline across the Mayuex property is the only way to provide rail service to the Sunshine terminal. (*See* Illinois Central Undisputed Material Facts 19–21). Thus, it is of no moment that Illinois Central cannot prove "actual, immediate, and impending" demand for rail service from the Sunshine terminal because "[i]t is sufficient, in carrying out the general plan of improvements contemplated in the near future, to show that the [Mayeux]'s land will be needed for the purposes set out in the [complaint]." *Fontenot*, 628 So.2d at 78. The Court therefore finds that the proposed expropriation will serve a necessary purpose within the meaning of Louisiana law.

## E. CONCLUSION

Although the Court can understand that the Mayeuxs would not want their land expropriated, the evidence before the Court clearly establishes that the proposed expropriation would serve a public and necessary purpose. First, by providing access to a public bulk liquid terminal to a wide number of potential customers and by enhancing the infrastructure for transporting chemicals, the proposed rail spur will serve a public purpose. Second, because the only way to provide rail access to the terminal is by crossing the Mayeux property, the proposed expropriation is for a necessary purpose. Accordingly,

IT IS ORDERED that Illinois Central Railroad Company's Motion for Summary Judgment is GRANTED.